UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 10-24682-EEB |
| NEXHORIZON COMMUNICATIONS, INC. | ) | |
| EIN: 13-4151225 | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| IN RE: | ) | |
| | ) | Case No. 11-17956-EEB |
| NEXHORIZON BROADBAND OF | ) | |
| SOUTHERN CALIFORNIA, INC. | ) | Chapter 11 |
| | ) | |
| EIN:  33-0397477 | ) | |

**MOTION FOR APPROVAL OF POST-PETITION FINANCING**

The Debtors, by and through their attorneys, Kutner Miller Brinen, P.C., move the Court pursuant to 11 U.S.C. §364(b and c) and Bankruptcy Rules 4001(c) and 9014 for entry of an order authorizing the Debtors to enter into a post-petition financing agreement with VinChetco, Inc. or an affiliate ("Lender") thereof which will provide the Debtors with up to $500,000 in new post-petition financing, and as grounds therefor state as follows:

**BACKGROUND**

1.     NexHorizon Broadband of Southern California, Inc. ("Broadband") filed a petition for relief under Chapter 11 of the Bankruptcy Code on April 11, 2011 and remains a Debtor-in-Possession.

2.     NexHorizon Communications, Inc. ("NCI;" and together with Broadband, the "Debtors") filed for relief under Chapter 11 of the Bankruptcy Code on June 11, 2010 and remains a Debtor-in-Possession.

3.     Broadband is owned 100% by NCI.

4.     The Debtors each own assets related to cable and telecommunication operations which are utilized jointly to provide the cable and telecommunication services

5.    The Debtors provide telecommunication and cable services in southern California.

6.    The Debtors' pre-petition lender with a security interest in substantially all of the Debtors' assets is Shelter Island Opportunity Fund, LLC ("Shelter Island").    The value of Shelter Island's collateral is less than the value of Shelter Island's claim if the assets were liquidated.

7.    Certain of the Debtors' vehicles are pledged as collateral to Ford Motor Credit.

8.    The Debtors plan to continue operation of their business throughout the Chapter 11 case and propose a Plan of Reorganization which provides for the continuation of the Debtors' business. It is only through a Plan that unsecured creditors will see a meaningful recovery on account of their claims.

9.    The Debtors have negotiated a new post-petition loan from Lender who has agreed to loan up to $500,000 to the Debtors for use during their Chapter 11 cases ("Loan"). The Loan will accrue interest at the rate of 5% per annum and in the case of default at the rate of 10% per annum. The Loan will mature on the earlier of: (a) the date the Note is accelerated after an Event of Default; (b) the date the Borrowers' Chapter 11 Cases are converted to a Chapter 7 cases or dismissed; or (c) one year from the date of the Lending Agreement.  The Lender will make the Loan pursuant to the Loan Agreement attached hereto as Exhibit A; Security Agreement attached hereto as Exhibit B; and the Promissory Note attached hereto as Exhibit C.

10.    The Lender's Loan will be secured by a first lien on the otherwise unencumbered assets, and will be junior to all existing liens.  The Loan will have a priority administrative expense claim in the cases of both Debtors.  The proceeds of the Loan will be available to the estates of both Debtors.

11.    The Loan proceeds will be used to fund the Debtors' operations through a Plan of Reorganization.    On an interim basis upon entry of a interim Order approving the Loan and upon entry of a Final Order, the Debtors have prepared a budget setting forth its expected expenditures

from the Loan Proceeds, which budget has been approved by the Lender.  A copy of the budget is attached hereto and incorporated herein as Exhibit D ("Budget").

12.   The majority of the Debtors revenues and available cash are derived from the ongoing operation of the Debtors in providing cable, internet and telecommunication services.  NCI allows Broadband to use its assets and Broadband will either pay rent to NCI or will pay expenses directly. Without the financing provided through the Loan, the Debtors may not have enough revenue to pay post-petition expenses.  It is critical for the Debtors' operation to pay labor and expenses including system upgrades, purchased new equipment, advertising, legal expense, and insurance and other administrative expenses that are incurred on an ongoing basis.  The Debtors' ability to survive is dependant upon providing cable and communication services without interruption.

13.   In order to provide adequate protection to the Lender for the Loan, the Debtors propose the following:

a.      Pursuant to Section 364(b) of the Bankruptcy Code the Loan shall constitute an allowed administrative expense claim in the Chapter 11 cases, provided however that Lender's rights hereunder shall be subordinate to (i) any fees and expenses awarded to the Debtors' bankruptcy counsel, (ii) any fees and expenses awarded to any professionals employed by any creditors' committee appointed in these cases, and (iii) fees owed pursuant to 28 U.S.C. § 1930(a)(6) (see paragraph 9 of the Lending Agreement);

b.      shall be secured by all assets pursuant to Section 364(c)(2 and 3) of the Bankruptcy Code(see paragraph 9 of the Lending Agreement).

c.      The Debtors will maintain adequate insurance coverage on all assets and adequately insure against any potential loss as required in the Lending Agreement (see paragraph 14(d) of the Lending Agreement);

    d.     The Debtor will provide a copy of the reports filed with the United States Trustee (see paragraph 14(1) of the Lending Agreement) ; and

    e.     The Debtors will only expend cash pursuant to the Budget subject to reasonable fluctuation (see paragraph 4 of the Lending Agreement).

14.  Should the Debtors default under the terms of the Lending Agreement, the Debtors' approved use of the Loan will stop and the Lender will have the ability to call a default under the Lending Agreement (see paragraph 17 of the Lending Agreement).

15.   Approval of the post-petition borrowing in accordance with this Motion and pursuant to the Budget, Exhibit D, is, on an interim basis and a final basis, in the best interest of the Debtors, their creditors and the estates as it will allow the Debtors to maintain its ongoing business operations, allow the Debtors to generate revenue, and provide the Debtors with an opportunity to propose a meaningful Plan.

## REQUEST FOR EMERGENCY INTERIM RELIEF

16.   Without the immediate use of the Loan, the Debtors will not be able to fully fund ongoing business operations.  The Debtors therefore respectfully request that the Court approve interim use of the Loan pending final approval.

WHEREFORE, the Debtors pray that the Court make and enter an Order authorizing the Debtors to borrow up to $500,000 from the Lender in accordance with this Motion and the Secured Lending Agreement, through the date of a final hearing, authorize the Debtors to provide adequate protection to Lender in the form of that set forth herein, scheduling a final hearing on approval of the Loan, and for such further and additional relief as to the Court may appear proper.

DATED: April 11, 2011

Respectfully submitted,

By: _____
    Aaron A. Garber, #36099

**KUTNER MILLER BRINEN, P.C.**
303 E. 17th Avenue, Suite 500
Denver, CO  80203
Telephone:  (303) 832-2400
Telecopy: (303) 832-1510
Email: aag@kutnerlaw.com

## LENDING AGREEMENT

This Lending Agreement ("Lending Agreement") is entered into as of April 8, 2011 by and between Vinchetco, Inc. or an affiliate thereof ("Lender") and NexHorizon Communications, Inc., a Delaware corporation ("NXHZ") and NexHorizon Broadband of Southern California, Inc., a California corporation ("Broadband") in the to be requested jointly administered chapter 11 bankruptcy proceedings (the "Cases") pending as Case Nos. 10-24682-EEB and 11-17956 -EEB in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") (together, "Borrowers" or "Debtors") as follows:

## RECITALS

1.      NXHZ filed a Voluntary Petition for protection under Chapter 11 of the Bankruptcy Code on June 11, 2010 (the "Petition Date"), Case No. 10-24682-EEB. Broadband will file a Voluntary Petition for protection under Chapter 11 of the Bankruptcy Code on April 11, 2011 (the "Petition Date"), Case No. 11-17956-EEB. The Debtors will file a motion to have the cases jointly administered.

2.      The Debtors' businesses consist of the ownership and operation of a cable television, internet and telephone company that provides service is rural areas of southern California ("Business").

3.      The Debtors do not have sufficient funds with which to continue to operate the Business and confirm a Plan of Reorganization without the benefit of post-petition financing as proposed herein.

4.      The Borrowers have requested that the Lender make available to the Borrowers a convertible credit facility in the aggregate principal amount of up to $300,000 ("Loan").   The proceeds will be used to fund the Business operations and case administration prior to plan confirmation and fund an account to cover the Debtors' pre-Petition Date cash collateral of an amount not to exceed $500,000.

5.      In order to secure the repayment of the Loan, Borrowers will generally provide the Lender with the following: (A) an allowed administrative expense claim in the Debtors' Chapter 11 cases pursuant to Section 364(b) of the Bankruptcy Code having priority over all unsecured debt as an administrative expense, provided however that Lender's rights hereunder shall be subordinate to (i) any fees and expenses awarded to the Debtors' bankruptcy counsel, (ii) any fees and expenses awarded to any professionals employed by any creditors' committee appointed in these cases, and (iii) fees owed pursuant to 28 U.S.C. § 1930(a)(6); and (B) secured by assets of the estates pursuant to Section 364(c) (2 and 3).



**EXHIBIT A**

the aggregate principal amount not to exceed $500,000, subject to the restrictions set forth herein. Such commitment shall become effective upon approval by the Bankruptcy Court.

4.      **Use of Loan Proceeds**. The proceeds of the Loan shall be used by the Borrowers to fund the Borrowers' operating and administrative expenses during the continued administration of the Chapter 11 Cases and post Plan confirmation pursuant to budgets provided to the Lender. The Lender shall not distribute to the Debtors $50,000 of the proceeds of the Loan and shall hold such amount for the benefit of Debtors' counsel to be paid to Debtors' counsel upon entry of an order of the Bankruptcy Court approving any amount up to $50,000 to be paid as a retainer from the Loan proceeds, an Order approving the fees and expenses of Debtors' counsel, or any other order authoring all or any portion of the $50,000 to be paid to Debtors' counsel.

5.      **Convertible Note**. The Loan of the Lender shall be evidenced by the Convertible Note, duly executed on behalf of the Borrowers payable to the order of the Lender in an amount equal to the $500,000 loan commitment. The Post-Petition Loan must be repaid as a condition thereof or at the Lenders option convert some or all of the principal and accrued interest to Class C Preferred stock at the rate of 5 Class C Preferred Shares per each $1 converted.

6.      **Maturity of Loan**. The Loan shall mature and the principal amount thereof shall be due and payable on the Maturity Date.

7.      **Interest**. The Loan shall bear interest on the outstanding principal amount thereof, for each day from and including the date the Loan is made to but excluding the date on which the Loan becomes due at a rate per annum (computed on the basis of the actual days elapsed over a year of 360 days) equal to 5% prior to confirmation of the Plan and 5% thereafter. After default, the Loan shall bear interest in the same manner as set forth above at the rate of 10% per annum. Interest on the Loan shall accrue and be due and payable upon prepayment or at the Maturity Date for the Loan, whether by acceleration or otherwise and after the Maturity Date on demand.

8.      **Prepayment**. The Borrowers shall have the right at any time and from time to time to prepay the Loan in whole or in part. All prepayments shall be accompanied by accrued but unpaid interest on the principal amount being prepaid to the date of prepayment. Once a prepayment is made, whether it is mandatory or discretionary, it may not be re-advanced to the Borrowers without the express written consent of Lender.

9.      **Priority and Security Interest**. Pursuant to Section 364(b) of the Bankruptcy Code the Loan shall constitute an allowed administrative expense claim in the Chapter 11 cases, provided however that Lender's rights hereunder shall be subordinate to (i) any fees and expenses awarded to the Debtors' bankruptcy counsel, (ii) any fees and expenses awarded to any professionals employed by any creditors' committee appointed in these cases, and (iii) fees owed pursuant to 28 U.S.C. § 1930(a)(6) and shall be secured by all assets pursuant to Section 364(c)(2 and 3) of the Bankruptcy Code. Borrowers hereby grant to Lender a security interest in all of the Borrowers' assets, real and personal property, to secure the repayment of the Second

3

Loan. Borrowers shall execute such Security Agreements and assignments of leases and contracts as may be necessary to effectuate this security interest. Notwithstanding the priority nature of the Loan during the Borrowers' Chapter 11 cases, the co-equal priority shall not be grounds for disgorgement of those professional fees or other administrative expenses which have been paid by the Borrowers with the proceeds of the Loan pursuant to the terms of the Loan and prior to the Maturity Date for the Loan.

10. **Conditions Precedent.** The obligation of the Lender to make a loan to the Borrowers is subject to the satisfaction of the following conditions precedent, unless waived by the Lender:

   a. The Lender shall have received the duly executed Convertible Note payable to the order of the Lender.

   b. The Lender shall have received evidence satisfactory to it that all conditions precedent to making the Loan have been met including, without limitation, a certificate to such effect signed by an officer of the Borrowers.

   c. The Lender shall have received a copy of a final order from the Bankruptcy Court approving this Lending Agreement which shall have been entered by the Bankruptcy Court on such notice and with such terms as may be satisfactory to the Lender and the Borrowers and which shall have not been reversed, modified, annulled, vacated or stayed. $200,000 of the Loan facility will be available to be drawn upon (subject to the budget) upon entry of an order of the Bankruptcy Court approving the Loan on an interim basis (or such lesser amount as is approved to be drawn pursuant to such interim order), expect that $50,000 shall not be delivered to the Debtors and shall be held by the Lender for the benefit of Debtors' counsel as set forth in paragraph 4 above.

   d. The Lender shall have received all documents it may reasonably request.

   e. Prior to making available each advance under the Loan, the Lender shall have received a budget in form and substance satisfactory to the Lender and such other information as may reasonably be requested by the Lender.

11. **Representations and Warranties.** In order to induce the Lender to make the Loan, the Borrowers represent and warrant as follows:

   a. Subject to Bankruptcy Court approval, the Borrowers have the requisite power and authority to effect the transactions contemplated herein and has all requisite power and authority and the legal right to own and operate its property as is contemplated under this Lending Agreement.

4



b. Subject to Bankruptcy Court approval, the execution, delivery and performance by the Borrowers of each of the Agreement and Note are within the power of the Borrowers and have been duly authorized and delivered by the Borrowers and the Note will be when executed and delivered hereunder a valid, legal and binding obligation of the Borrowers enforceable against the Borrowers in accordance with its terms and will not violate any law, regulation or Court order.

12.   **Environmental Law Compliance**.  The Borrowers have complied, are currently in compliance and will continue to comply in all respects with any and all environmental laws, ordinances, orders or decrees of any state, federal, municipal or other governmental body or agency applicable to the Borrowers, including but not limited to, the State of Colorado and those of the United States.

13.   **No Defenses**.  The Borrowers are justly indebted to the Lender for the obligations created by this Lending Agreement and the Borrowers do not currently have and agree that they will not at any time hereafter assert any defense, offset or counterclaim with respect to the payment of its obligations under this Lending Agreement and the Note.

14.   **Affirmative Covenants**.

a. The Borrowers shall provide the Lender with all interim statements and operating reports ("Reports") filed by the Borrowers with the Office of the United States Trustee concurrently with the filing of the Reports, either by facsimile or personal delivery.  Those reports must be filed on or before the 20th day of each calendar month during the term of the Agreement and the Debtors agree to timely file all such reports.

b. The Borrowers shall provide the Lender with an annual balance sheet, statement of income and retained earnings and statement of changes in financial position, all of the Borrowers for the past fiscal year.  Such financial statement shall be provided within ninety (90) days of the end of each fiscal year of the Borrowers during the term of this Lending Agreement.  From time to time hereafter, Lender may discover that it requires further financial reports and information from Borrowers.  The Borrowers agree that they will fully cooperate with the Lender and will provide Lender with such requested reports and information as may reasonably be requested within five business days of its receipt of the Lender's written request.

c. The Borrowers will keep proper books of record and accounting in which true and correct entries in conformity with Generally Accepted Accounting Principles shall be made of all dealings and transactions in relation to its business and activities and will permit representatives of the Lender to visit and inspect any of its properties to examine and make abstracts from any of its books and records and to discuss its affairs, finances and accounts with its officers, appropriate



5

employees, independent public accountants, consultants and financial advisors at all such reasonable times during normal business hours upon reasonable notice.

d. The Borrowers will keep all material property useful and necessary in their Business in good working order and condition, ordinary wear and tear excepted; will maintain, with a financially sound and reputable insurance company insurance on all its property in at least such amounts and against at least such risks as are usually insured against by companies of established repute engaged in the same or similar business and will furnish to the Lender upon written request full information as to the insurance carrier.

e. The Borrowers will comply with all court orders in the Chapter 11 cases.

f. The Borrowers will pay all agreed obligations arising under this Lending Agreement after the execution of the Agreement promptly and in accordance with the terms and conditions hereof and pay and discharge promptly all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property before the same shall become in default as well as all material lawful claims for labor, materials and supplies which if unpaid might become a lien or a charge upon assets of the Borrowers.

g. The Borrowers will furnish to the Lender's counsel or any other party designated by Lender, copies of all pleadings, motions, applications, financial information and other documents filed with the Bankruptcy Court by or on behalf of the Borrowers or filed by any other party in interest in the Borrower's Chapter 11 cases.

15.     **Further Assurances**. Upon the request of the Lender, the Borrowers shall duly execute and deliver or cause to be duly executed and delivered at the cost and expense of the Borrowers such further instruments as may be necessary or proper in the reasonable judgment of the Lender to carry out the provisions and purposes of this Lending Agreement.

16.     **Negative Pledge and Covenants**. The Borrowers will not create, assume or suffer to exist any administrative expense claims under Section 364(c)(1) of the Bankruptcy Code ranking *pari passu* with or superior to or junior to the claims of the Lender or apply to the Bankruptcy Court for authority to do so except for the obligations created or set forth herein. During the term of this Lending Agreement, the Borrowers shall not:

a. Incur, assume or create any new debt or increase any existing debt except: (i) debt owed by Borrowers to Lender; (ii) trade debt incurred in the ordinary course of business under regular business terms, which debt shall not remain in excess of sixty (60) days past due unless a good faith dispute exists as to the obligation; (iii) debt provided for under this Lending Agreement; and (iv) debt consented to by the Lender.

6



    b.  Issue or obtain subscription for issuance of additional equity interests to new or existing shareholders.

    c.  Distribute directly or indirectly, for consideration or otherwise, any amounts to Borrower's existing shareholders.

    17.  **Events of Default.**  Any one or more of the following events shall have occurred and be continuing shall constitute an Event of Default:

    a.  The Borrowers shall fail to pay within fifteen (15) days of the  due date the obligations created by this Lending Agreement or the Note;

    b.  The Borrowers shall fail to observe or perform any covenant, agreement or obligation contained in this Lending Agreement or in the Note;

    c.  Any representation, warranty, certification or statement made by the Borrowers in this Lending Agreement or in any certificate, financial statement or other document delivered pursuant hereto shall prove to have been incorrect in any material respect when made or deemed made;

    d.  This Lending Agreement shall cease to be in full force and effect and valid or any security interest or lien purported to be created hereby shall cease to be valid and perfected or the Borrowers shall so have asserted;

    e.  The Order approving this Lending Agreement shall be modified, vacated, supplemented or amended in any respect or the Borrowers shall apply to the Bankruptcy Court for authority to do so without the prior written consent of the Lender;

    f.  The Bankruptcy Court shall enter an Order:

        i.  Dismissing the Chapter 11 cases;

        ii.  converting the Chapter 11 cases to a case under Chapter 7 of the Bankruptcy Code;

        iii.  appointing a Trustee in the Chapter 11 cases

    g.  There shall arise any lien in the Chapter 11 cases encumbering any presently unencumbered assets owned by the Borrowers;

    h.  The Bankruptcy Court shall enter an Order approving a Disclosure Statement in connection with a Plan of Reorganization proposed by the Borrowers or a third

7



party which Plan does not provide for payment in full in cash or conversion to stock of the Note on its Maturity Date or upon confirmation of the proposed Plan;

i.   Any non-monetary judgment or order with respect to a pre- or post-petition transaction or event shall be entered against the Borrowers which does or could reasonably be expected to cause a material adverse condition determined at the sole discretion of the Lender;

j.   There occurs any effective or actual change in control of the Borrowers absent the prior written consent of the Lender; or

k.   The Lender deems himself insecure as a result of a material adverse change in the Borrowers' financial condition, prospects, liquidity or ability to service its financial obligations;

and in every such Event of Default and at any time thereafter during the continuance of such Event of Default without further order of or application to the Bankruptcy Court the Lender may take any or all of the following actions at the same or at different times:

i.   by notice to the Borrowers terminate the Loan Commitment herein;

ii.  by notice to the Borrowers declare the Note together with all interest, fees and expenses accrued thereon to be and the Note shall thereupon become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; and

iii. Upon written notice to the Borrowers exercise such remedies as are provided for elsewhere in this Lending Agreement, the Note or as may otherwise be available under applicable law.

18.   **Notice**. Delivery of any notice required herein to be given to the Borrowers shall be deemed sufficient and complete if any such letter or notice is sent by messenger, Federal Express and/or telecopied to the Borrowers and Borrowers' attorney at the following address:

NexHorizon Communications, Inc.
P.O. Box 7208
Westminster, CO  80021

NexHorizon Broadband of Southern California, Inc.
P.O. Box 7208
Westminster, CO 80021

8



with a copy to:

Aaron A. Garber, Esq.
Kutner Miller Brinen, P.C.
303 East Seventeenth Avenue
Suite 500
Denver, CO 80203
Telecopier: (303) 832-1510

Notice to Lender shall be deemed sufficient and complete if such letter or notice is sent by
Federal Express, email and/or telecopied to:

Vinchetco, Inc.
Attn: Chet Noblett
301 West Abrams
Arlington, Texas 76101

With a copy to:

Grey Pierson
Pierson & Behr
301 West Abram St.
Arlington, TX 76010
Telecopier: (817) 861-9008

19.    **Headings**.  The headings set forth herein are inserted for convenience of the
parties only, and shall not be used to interpret or construe or in any way affect the meaning of the
terms and provisions of this Lending Agreement.

20.    **Neutral Construction**.  This Lending Agreement is the product of negotiation
among the parties hereto and represents the jointly conceived, bargained for, and agreed upon
language mutually determined by the parties to express their intentions of entering into this
Lending Agreement. Any ambiguity or uncertainty in this Lending Agreement shall be deemed to
be caused by, or attributable to, all parties hereto collectively. In any action to enforce or interpret
this Lending Agreement, the Agreement shall be construed in a neutral manner and no term or
provision of this Lending Agreement, or the Agreement as a whole, shall be construed more or
less favorably to any one party or groups of parties, to this Lending Agreement.

21.    **Integration**.  Except as expressly provided in this Lending Agreement, this
Lending Agreement is the final written expression and the complete and exclusive statement of all
of the agreements, conditions, promises and covenants among the parties with respect to the
subject matter hereof and supersedes all prior or contemporaneous agreements, negotiations,



representations, understandings and discussions among the parties and/or their respective counsel with respect to the subject matter covered hereby. Any amendment or modification to this Lending Agreement, in order to be legally binding, must be in writing specifically referring to the Agreement and signed by duly authorized representatives of all parties, or otherwise approved by the Bankruptcy Court.

22.     **No Benefit to Nonparties**.  Nothing contained in this Lending Agreement is intended nor shall it be construed or deemed to confer any rights, powers, or privileges on any person, firm, partnership, corporation or other entity not an express party hereto or a successor in interest thereof. The parties reserve all of their rights under law, equity, or otherwise with respect to such non-parties and/or successors in interest.

23.     **Terms Binding On Trustee**.  The terms and conditions of this Lending Agreement and the order entered thereon shall be binding upon any Trustee appointed in Borrower's Chapter 11 cases.

24.     **Limitation of Relationship**.  The relationship of Borrowers and Lender shall continue to be that of borrower and creditor. Nothing contained in this Stipulation shall be deemed or construed to create any partnership, tenancy-in-common, joint tenancy, joint venture, co-ownership or other relationship between Lender and Borrowers.

25.     **Power of Representatives**.  Any party executing this Lending Agreement in a representative capacity is duly authorized and empowered to do so.

26.     **Counterparts**.  This Lending Agreement may be executed in any number of counterparts, each of which shall be an original. Such counterparts shall together constitute but one and the same Instrument.

27.     **Waiver**.  No failure or delay by the Lender in exercising any right, power, or privilege hereunder or under the Note shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

28.     **Expenses**.  If an Event of Default occurs the Borrowers shall pay all out-of-pocket expenses incurred by the Lender including reasonable attorney's fees and disbursements of Lender's counsel in connection with such Event of Default and collection and other enforcement proceedings resulting therefrom.

29.     **Successors and Assigns**.  This Lending Agreement shall be binding upon and inure to the benefit of the Lender and all further holders of the Note and their respective successors and assigns.  This Lending Agreement shall be binding upon the Borrowers and its successors; however, the Borrowers may not assign or transfer any of its rights or obligations under this Lending Agreement without the prior written consent of the Lender.

10

30.   **Choice of Law**.  This Lending Agreement and the Note shall be construed in accordance with and governed by the laws of the State of Colorado except to the extent preempted by federal law.

31.   **Effectiveness**.  This Lending Agreement shall not become effective until it has been executed by the Borrowers and the Lender and a final order has been entered in the Borrowers' bankruptcy cases approving this Lending Agreement.

The parties hereto have caused this Secured Lending Agreement to be duly executed as of the date first written.

**LENDER:**
Vinchetco, Inc.

By:_____
           Chet Noblett, President

**BORROWER:**

NexHorizon Communications, Inc.

By:_____
           Calvin D. Smiley, Sr. President

NexHorizon Broadband of Southern California, Inc.

By:_____
           Calvin D. Smiley, Sr. President

11

30.   **Choice of Law**.  This Lending Agreement and the Note shall be construed in accordance with and governed by the laws of the State of Colorado except to the extent preempted by federal law.

31.   **Effectiveness**.  This Lending Agreement shall not become effective until it has been executed by the Borrowers and the Lender and a final order has been entered in the Borrowers' bankruptcy cases approving this Lending Agreement.

The parties hereto have caused this Secured Lending Agreement to be duly executed as of the date first written.

**LENDER:**

Vinchetco, Inc.

By: _____

Chet Noblett, President

**BORROWER:**

NexHorizon Communications, Inc.

By: _____

Calvin D. Smiley, Sr. President

NexHorizon Broadband of Southern California, Inc.

By: _____

Calvin D. Smiley, Sr. President

11

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT is entered into as of April 8, 2011 between NexHorizon Communications, Inc., a Delaware corporation ("NXHZ"), NexHorizon Broadband of Southern California, Inc., a California corporation ("Broadband"), jointly the debtors ("Debtors"), and Vinchetco, Inc. ("Secured Party"), based on the following recitals:

## RECITALS:

A.     The Debtors have requested that the Secured Party make one or more loans to the Debtors to assist them in meeting its ongoing operating expenses.

B.     Secured Party made a loan ("Loan") to the Debtors of up to $500,000 evidenced by a promissory note payable to the Secured Party dated on or about April 8, 2011, together with interest and other amounts as therein provided.

C.     In consideration of the Loan, as security for the full payment of the Loan, Debtors have granted to Secured Party a security interest in the Debtors' assets described in Schedule A attached hereto and by this reference made a part hereof and all proceeds and products thereof (the "Collateral") subject to any and all existing liens and encumbrances on the Collateral.

D.     Secured Party wishes to obtain a security interest in the Collateral on the terms and conditions set forth below.

NOW, THEREFORE, the parties agree as follows:

1.     Definitions.  The terms used herein shall have the same meaning as in the Colorado Uniform Commercial Code (the "Code"), unless the context in which used indicates otherwise.

2.     Security Interests.  Debtors hereby grant to Secured Party a security interest in the Collateral, subject to existing liens and encumbrances, to secure the performance and payment of the following obligations (the "Obligations"):

        a.     The Note payable to Secured Party, in the aggregate principal amount not to exceed $500,000 (together with interest and other amounts as therein provided) and all extensions or renewals of such Note.

        b.     Any and all advances by Secured Party to Debtors including future and additional advances and all extensions or renewals thereof.

3.     Representations, Warranties and Covenants.  The Debtors hereby represent, warrants, covenant and agree as follows:

        a.     Except for the security interest granted hereby, and the pre-existing security interests held by other creditors on the Collateral identified on Schedule B



**EXHIBIT B**

hereto, Debtors are or will be the owner of all the Collateral free from any adverse lien, security interest or encumbrance.

b.    Debtors shall join with Secured Party in executing one or more Financing Statements pursuant to the Code in form satisfactory to Secured Party and will pay the cost of filing the same in all public offices wherever filing is deemed by Secured Party to be necessary or desirable.

c.    Debtors, their agents, servants or employees shall not sell, assign or otherwise transfer any material portion of the Collateral, either in whole or in part, or any interest therein without the prior written consent of Secured Party and shall notify Secured Party of Debtors' intent to offer to sell or assign the Collateral.

d.    Debtors shall keep the Collateral free from any future claim, adverse lien, security interest or encumbrance (except as expressly permitted by the Secured Party).

e.    Secured Party may examine and inspect the Collateral at any time, wherever located.

f.    Debtors shall pay promptly when due all taxes and assessments upon or with respect to the Collateral and this Agreement; Secured Party may (but shall not be obligated to) discharge taxes, assessments, liens, security interests or other encumbrances at any time levied or placed on the Collateral, pay for any insurance on the tangible Collateral required to be maintained by Debtors hereunder, and pay for, make or provide for any maintenance, repair or preservation of the tangible Collateral as herein required; Debtor shall reimburse Secured Party on demand with interest at the rate provided in the Note for any payment made, or any expense incurred by Secured Party pursuant to the foregoing authorization, and any such payment or expense shall be an Obligation secured hereunder; notwithstanding the foregoing, Debtors shall be entitled to contest in good faith any taxes or assessments upon or with respect to the Collateral.

g.    With respect to the tangible Collateral:

    (i)    The tangible Collateral is used or bought primarily for business purposes.

    (ii)    Debtors shall provide a list of the location of the tangible Collateral and shall promptly notify Secured Party of any proposed change in the location of a material portion of the tangible Collateral and will not remove tangible Collateral from its current location without the prior written consent of the Secured Party.

(iii)       The tangible Collateral shall at all times be considered personal property; the tangible Collateral is not and will not be so installed, affixed or attached to the real estate of Debtors or any other person so as to be a part thereof or become in any sense a fixture and nothing in this Agreement shall be construed as indicating an intention of Secured Party or Debtors that such item or items is or is to be a fixture; nevertheless, if any item or items of tangible Collateral is or is to be installed, affixed or attached to real estate (whether or not such installation, affixment or attachment may be construed to be a fixture) prior to perfection of the security interest granted to Secured Party, Debtors shall upon demand use its best efforts to furnish Secured Party with a disclaimer or disclaimers, in a form satisfactory to Secured Party signed by all persons having an interest in the real estate, of any interest in the tangible Collateral which is or may be prior to Secured Party's interest.

(iv)       If certificates of title are issued or outstanding with respect to any of the tangible Collateral, Debtors shall cause the interest of Secured Party to be properly noted thereon if requested by Secured Party.

(v)        Debtors have and shall maintain insurance on tangible Collateral at all times against risks of fire (including so-called extended coverage), theft and other risks as Secured Party may reasonable require, and in the case of motor vehicles, collision insurance containing such terms, in such form, and for such periods and written by such companies as may be reasonably satisfactory to Secured Party; all such insurance shall be payable to the Secured Party and Debtors as their interests may appear; all policies of insurance shall provide for a minimum of thirty (30) days' prior written cancellation or modification notice to Secured Party and at the request of Secured Party all policies shall be delivered to and held by the Secured Party; Secured Party may act as attorney-in-fact for the Debtors in obtaining, settling and canceling such insurance and endorsing any checks, drafts or other forms of payment issued in connection therewith.

(vi)       Debtors shall keep the tangible Collateral in good working order and repair and will not waste or destroy tangible Collateral or any part thereof; Debtors shall not use the tangible Collateral in violation of any statute, ordinance, rule or regulation.

i.      With respect to the intangible Collateral:

(i)     Debtors' records concerning all intangible Collateral are and shall be kept at the address shown in Section 3(b) as Debtors' chief place of business, unless Debtors give prior written notice to Secured Party of any other location, which shall be subject to prior approval by Secured Party in its sole and absolute discretion. Should the Debtors change their chief place of business and new or amended UCC-1 Financing Statements be required, the Debtors shall cooperate with the Secured Party in the filing of such Financing Statements.

(ii)    Intangible Collateral represents bona fide and existing indebtedness, obligations, liabilities or rights and privileges owed or belonging to Debtors to which there is no defense, setoff or counterclaim against Debtors and in connection with which there is no default with respect to any payment or performance on the part of the Debtors or any other party.

(iii)   Debtors shall at all times keep accurate and complete records of payment and performance by Debtors or other parties on intangible Collateral and Secured Party or any of its agents shall have the right to call at the Debtors' places of business at intervals to be determined by the Secured Party and without hindrance or delay to inspect, audit, check and make extracts from the books, records, correspondence and other data relating thereto.

(iv)    Debtors shall immediately inform the Secured Party of any default in payment or performance which is material by Debtors or other parties or of claims made by others in regard to intangible Collateral and shall not change the terms thereof without the prior written consent of Secured Party; Debtors shall make all payments and perform all things on Debtors' part to be paid or performed on intangible Collateral when due; Debtors hereby authorizes the Secured Party to cure any default in payment or performance by Debtors on intangible Collateral, provided, however, Secured Party shall be under no obligation to do so; Debtors shall reimburse Secured Party on demand with interest at the rate stated in the Note for any payment made or any expense incurred by Secured Party pursuant to the foregoing authorization and any such payment or expense shall be an Obligation secured hereunder.

(v)     Debtors shall, upon request of the Secured Party following an Event of Default, and Secured Party itself may in the name of Secured Party or Debtors at any time (whether or not the Debtors are in default hereunder), verify directly with the

> obligors the indebtedness due Debtors on any account or other item of intangible Collateral and notify the obligors on or other parties to any item of intangible Collateral of the Secured Party's security interest.

4. <u>Events of Default</u>. Debtors shall be in default under this Agreement upon the happening of any of the following events or conditions:

    a. An Event of Default shall occur and be continuing under the Note or Debtors shall default in the payment, performance or observance of any of its other Obligations to Secured Party or any of the terms hereof.

    b. Loss, theft, damage or destruction to all or any material portion of the Collateral.

5. <u>Rights and Remedies upon Default</u>. Upon occurrence of any of the above events of default, Secured Party may accelerate all the Obligations secured hereby and shall have, in addition to all other rights and remedies, the rights and remedies of a Secured Party under the Code including, without limitation, the right to take possession of the Collateral including, but not limited to, the notification of the Debtors' account debtors to make payment directly to the Secured Party (after acceleration), and for that purpose Secured Party may, so far as Debtors can give authority therefore, enter upon any premises on which the Collateral may be located or situated and remove the same therefrom or without removal render same unusable and may use or dispose of the Collateral on Such premises without any liability for rent, storage, utilities or other sums. Upon request Debtors shall assemble and make the Collateral available to Secured Party at a place to be designated by Secured Party, which is reasonably convenient to Debtors and Secured Party. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, Secured Party shall give to Debtors at least ten (10) days' prior written notice of the time and place of any public sale or the time after which any private sale or any other intended disposition is to be made. Debtors shall remain liable for any deficiency on the Obligations following any public or private sale of the Collateral. Secured Party shall also have the right to (a) apply for and have a receiver appointed by a court of competent jurisdiction in any action taken by the Secured Party to enforce its rights and remedies hereunder in order to manage, protect and preserve the Collateral, (b) continue the operation of the business of the Debtors and (c) collect all revenues and profits thereof and apply the same to the payment of (i) all expenses and other charges of such receivership, including the compensation of the receiver, and (ii) the obligations secured hereby until a sale or other disposition of such Collateral shall be finally made and consummated. The Secured Party shall also have the right to proceed with any collection remedy as against the Debtors without regard to the existence or timing of foreclosure proceedings against the Collateral. All such remedies shall be subject to the Bankruptcy Code.

6. <u>Waivers</u>. Debtors waive notice of the acceptance of this Agreement and all other notices, demands or protests to which Debtors might otherwise be entitled by law (and which may be lawfully waived), with respect to this Agreement, the Obligations secured hereby or the Collateral Secured Party shall have no duty as to (a) the collection or protection of Collateral or any income thereon beyond reasonable care, (b) the preservation of rights against prior parties, or (c) the preservation of any rights pertaining to the Collateral beyond reasonable care. Secured Party may exercise its rights and remedies with respect to Collateral without resorting to other security or

sources for payment. Secured Party shall not be deemed to have waived any of its rights or remedies hereunder unless such waiver be in writing and signed by Secured Party. No delay or omission on the part of Secured Party in exercising any rights or remedies shall operate as a waiver of such right or remedy or any other right or remedy. A waiver on any one occasion shall not be construed as a bar or waiver of any right or remedy on future occasions. All rights and remedies of Secured Party hereunder shall be cumulative and may be exercised singularly or concurrently.

7.   Attorneys' Fees and Other Expenses. Debtors shall pay to Secured Party any and all expenses, court costs and reasonable attorneys' fees incurred or paid by Secured Party in protecting and enforcing its rights and remedies with respect to the Collateral, this Agreement or any Obligations secured hereby. Any such payments shall be made upon order from the Court after notice and an opportunity for a hearing.

8.   Severability. The unenforceability or invalidity of any provision or provisions of this Agreement shall not render any other provision or provisions herein contained unenforceable or invalid. Any provision or provisions of this Agreement which shall be in conflict with the laws of any state applicable hereto shall be deemed amended to conform to such applicable laws.

9.   Demands and Notices. All notices and other communications provided for under this Agreement shall be in writing (including facsimile or telegraphic communication) and mailed or telecopied or telegraphed or delivered, if to the Debtors, at P.O. Box 7208, Westminster, CO 80021, and if to Secured Party, at its address at 301 West Abram St., Arlington, TX 76101, or, as to each party as such other address as shall be designated by such party in a written notice to the other party complying with the foregoing terms. All such notices and communications shall, when mailed or telecopied or telegraphed, be effective when deposited in the United States mail, postage prepaid, certified, registered or express, return receipt requested or a facsimile actually telecopied or delivered to the telegraph company charges prepaid, respectively, addressed as aforesaid.

10.   Assignment. If at any time or times by sale, assignment, negotiation, pledge or otherwise, Secured Party transfers any Obligation or Obligations, such transfer shall carry with it Secured Party's rights and remedies under this Agreement with respect to the Obligation or Obligations transferred, and the transferee shall become vested with such rights and remedies whether or not they are specifically referred to in the transfer. If and to the extent Secured Party retains any other Obligation or Obligations, Secured Party shall continue to have the rights and remedies herein set forth with respect thereto. This Agreement shall be binding upon Debtors, their representatives, successors and assigns and inure to the benefit of Secured Party, its successors and assigns. If any Chapter 11 Trustee is appointed, he or she may petition the Court for removal of onerous terms of this Agreement upon notice and opportunity for a hearing to all parties in interest, except for the enforcement of the loan.

11.   Applicable Laws. This Agreement and all right and duties hereunder, including matters of construction, validity and performance, shall be governed by the laws of the State of Colorado. Each party hereto expressly consents to the exclusive jurisdiction of the Wyoming courts except for matters which can be tried only before a Federal Court in which case the parties agree that

the United States District Court for the District of Colorado or the United States Bankruptcy Court for the District of Colorado shall have jurisdiction.

      12.   <u>Terminology</u>.  Whenever used herein, the plural shall include the singular and vice versa and each gender shall include the other as the text and tenor of this Agreement shall indicate.

      13.   <u>Effective Date</u>.  This Agreement shall take effect when executed by the Debtors and delivered to the Secured Party and the Secured Party need not endorse its acceptance hereof unless, at its option, it wishes to do so to permit the filing of this Agreement as a financing statement.

      14.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

      IN WITNESS WHEREOF, Debtors have caused this Agreement to be duly executed and delivered as of the date first above written.

DEBTOR:

NexHorizon Communications, Inc.      NexHorizon Broadband of Southern California, Inc.

By: _____      By: _____
    Calvin D. Smiley, Sr., President         Calvin D. Smiley, Sr., President

## Schedule A

**Asset List / Inventory List**

<u>Vehicles:</u>

2003 Chevy Astro, mileage: 50,452, vehicle is in poor condition.
          Location: 581 C Street in Chula Vista, CA

2002 Chevy S10, mileage: 88,004, vehicle is in very poor
          condition. Locatio     750

1998 Chevy 2500, mileage: 88,642, has a blown motor and is in
          poor condition. Location: 581 C Street in Chula Vista, CA

1998 Chevy S10, mileage: 89,523, needs repairs such as CPU
          unit (computer), fuel pump. Location: 581 C Street in
          Chula Vista, CA

1998 Chevy S10, mileage: 87,672, needs repair such as replacement
          of rear main seal. Location: 581 C Street in Chula Vista, CA

1995 Chevy Astro, mileage: 105,148, needs alternator, rear axle,
          and is in very poor condition. Location: 581 C Street in
          Chula Vista, CA

1974 Ford F350, mileage: 67,909, vehicle is only good for salvage
          value and cost to remove would likely exceed any value.
          Location: 581 C Street in Chula Vista, CA

One 2006 coax trailer, in fair condition, one inoperable coax trailer
          that cannot be repaired, cost to remove would exceed any
          salvage value. Location: 581 C Street in Chula Vista, CA

<u>Furniture / Computers</u>

5 Acer computers, 5 flat screen monitors, 2 Toshiba laptops and
          2 printers all approximately 2.5 years old

2 Toshiba laptops and 1 no name work station and 3 printers all
          5+ years old

3 desks - 20+ years old, couch and 3 chairs - 1+ years old

<u>Inventory</u>

COAX wire, fiber cable and amplifier cores in trucks and warehouse as used
          for daily repair, maintenance, and installation in normal course
          of business: Coax drop wire approx. 5,000 ft, Coax .500
          (distribution cable) approx 0 feet but normally stocked
          otherwise, Coax .750 (trunk) approx 5,000 ft, Fiber -
          12 count (transport) aprox 13,000 ft. Location, approximately
          40 amplifier cores: 581 C Street, Chula Vista, CA

<u>Cable TV System</u>

Cable TV system containing the following: 88 miles of overhead
          coax (550 MHz), 12.5 miles of underground coax (550 MHz),
          23 miles of underground coax (750 MHz), and 6 miles of Fiber
          overhead and 10 mile of Fiber underground (78 / 48
          / 12 count) and all related amplifiers, line extenders and power
          supplies. Approximately 1200 miles of empty conduit
          underground in East Chula Vista. Processing center currently
          offering 143 total channels, 73 of them digital, 51 Analog, 10
          high definition (HD) and 9 premium channels. Cable TV system
          operated from 1 Head End, all related equipment listed below
          rack by rack.

**Schedule B - Secured Creditors**

Shelter Island Opportunity Fund, Inc.- all assets

Ford Credit – all Ford vehicles

## CONVERTIBLE PROMISSORY NOTE

$500,000                                                          Denver, Colorado
                                                                  April 8, 2011

FOR VALUE RECEIVED, the undersigned, NexHorizon Communications, Inc., a Delaware corporation ("NXHZ"), Debtor-in-Possession in the United States Bankruptcy Court for the District of Colorado, Case No. 10-24682-EEB and NexHorizon Broadband of Southern California, Inc., a California corporation ("Broadband"), jointly the debtors ("Debtors") in the jointly administered chapter 11 bankruptcy proceedings (the "Case") pending as Case Nos. 10-24682-EEB and 11-17956  -EEB in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") ("Borrower"), hereby unconditionally promises to pay on or before the "Maturity Date", as defined in the Lending Agreement of even date herewith, to the order of VinChetco Investments, Inc., its successors and assigns ("Lender") at 301 West Abrams Arlington Texas 76101, or such other place and manner as may be designated by Lender, in lawful money of the United States of America, immediately available funds, the principal amount advanced from time to time and due on this Convertible Note, in an amount not to exceed $500,000, and the aggregate amount of fees, accrued and unpaid interest and costs accrued thereon or at the Lenders option convert some or all of the principal and accrued interest to Class C Preferred stock at the rate of 5 Class C Preferred Shares per each $1 converted.

All terms herein shall have those definitions as are ascribed to them in the Lending Agreement between the Parties of even date herewith.

1.     Repayment. Interest shall accrue on the outstanding principal balance of this note but shall not be compounded. The principal balance of this Note, together with any accrued but unpaid interest thereon, shall be due and payable on or before the date that is one year from the date hereof, or earlier as provided in the Lending Agreement (the "Maturity Date"). All payments shall be applied first to accrued interest and then to principal or at the Lenders option convert some or all of the principal and accrued interest to Class C Preferred stock at the rate of 5 Class C Preferred Shares per each $1 converted.

2.     Interest. This Note shall accrue interest in like money on the principal amount advanced hereunder from the date of disbursement at the rate of 5% per annum. After default, the Loan shall bear interest at the rate of 10% per annum (the "Default Rate"). Accrued interest on the Loan shall be payable upon any prepayment or at the Maturity Date for the Loan, whether by acceleration or otherwise and after the Maturity Date on demand.

3.     Prepayment. The indebtedness evidenced hereby may be prepaid in whole or in part, at any time and from time to time, without penalty. Any such payments shall be credited first to any accrued and unpaid interest and then to the outstanding principal balance hereof.

EXHIBIT C

4.      Waiver. Maker waives presentment, notice of dishonor and protest.

5.      Extension. Maker agrees that the Maturity Date of this Note, or any payment due hereunder, may be extended at any time or from time to time by Holder without releasing, discharging, or affecting Maker's liability.

6.      Invalidity. Any provision of this Note that is deemed invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable the remaining provisions of this Note.

7.      Attorneys' Fees. In the event a suit, action, arbitration, or other proceeding of any nature whatsoever, including without limitation any proceeding under the U.S. Bankruptcy Code, is instituted, or the services of an attorney are retained, to interpret or enforce any provision of this Note or with respect to any dispute relating to this Note, the prevailing party shall be entitled to recover from the losing party its attorneys', paralegals', accountants', and other experts' fees and all other fees, costs, and expenses actually incurred and reasonably necessary in connection therewith. In the event of suit, action, arbitration, or other proceeding, the amount thereof shall be determined by the judge or arbitrator, shall include fees and expenses incurred on any appeal or review, and shall be in addition to all other amounts provided by law.

8.      Relationship of Parties. Nothing in this Note shall create a relationship between Maker and Holder of partnership or of principal and agent, it being their intent that their relationship is that of debtor and creditor.

9.      Default. An Event of Default shall have occurred under this Note if the Borrower fails to pay or perform within ten (10) days of the Maturity Date any of the payments or obligations created by this Note. Upon occurrence of an Event of Default, all sums due hereunder shall be accelerated and shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by Borrower.

10.     No Waiver. No failure to accelerate the indebtedness evidenced hereby by reason of default hereunder, acceptance of a past-due installment or other indulgence granted from time to time, shall be construed as a novation of this Note or as a waiver of such right of acceleration or of the right of Lender to insist upon strict compliance with the terms of this Note or to prevent the exercise of such right of acceleration or any other right granted hereunder or by applicable laws. No extension of the time for payment of the indebtedness evidenced hereby or any installment due hereunder, made by agreement with any person or entity now or hereafter liable for payment of the indebtedness evidenced hereby, shall operate to release, discharge, modify, change or affect the original liability of the Borrowers hereunder or that of any other person now or hereafter liable for payment of the indebtedness evidenced hereby, either in whole or in part, unless Lender agrees otherwise in writing. This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement or any waiver, change, modification or discharge is sought.



2

11. <u>Notices</u>. Notices under this Note shall be made as provided in the Lending Agreement.

12. <u>Governing Law</u>. The validity, meaning, enforceability and effect of this Note, and the rights and liabilities of the parties, shall be determined in accordance with the laws of the State of Colorado.

NexHorizon Communications, Inc.

By: _____
    Calvin D. Smiley, Sr., President

NexHorizon Broadband of Southern California, Inc.

By: _____
    Calvin D. Smiley, Sr., President

3

# NexHorizon Broadband of Southern California, Inc.
## DIP Finance
## Budget

| Sources | | At DIP Approval | | Within 60 days |
|---|---|---|---|---|
| DIP Finance | $ | 300,000 | $ | 200,000 |
| **Uses** | | | | |
| 4th street beatification project - conversion to underground | | 108,000 | | 42,000 |
| Deposits | | 51,000 | | |
| Content expansion - new transcoders | | 50,000 | | |
| Legal | | 35,000 | | - |
| Advertising | | 30,000 | | 30,000 |
| G & A | | 20,000 | | 8,000 |
| Tax | | 6,000 | | - |
| Set top box | | - | | 50,000 |
| Amplifiers, line extenders, nodes | | - | | 25,000 |
| Installl cost, connecters, coax, etc. | | - | | 25,000 |
| Bucket truck | | - | | 20,000 |
| | | - | | - |
| | | - | | - |
| Total Uses | | 300,000 | | 200,000 |
| **Balance** | $ | - | $ | - |

EXHIBIT D